IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 18-CR-0149-1, -3 |
| | ) | |
| v. | ) | Judge Sharon Johnson Coleman |
| | ) | |
| MILLARD WILLIAMS and ROLAND BLACK, | ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Defendant Millard Williams and his co-defendants Michelle Jamison and Willie Alexander were charged with conspiracy to possess with intent to distribute 100 grams or more of furanyl fentanyl and related offenses. Defendant Roland Black was charged with attempted possession with intent to distribute 100 grams or more of furanyl fentanyl. Before the Court is the government's motion to conditionally admit certain co-conspirator statements against Williams under the co-conspirator exception to the hearsay rule pursuant to Federal Rule of Evidence 801(d)(2)(E) and *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978). For the following reasons, the Court reserves ruling in part, grants in part, and denies in part the government's *Santiago* proffer over Williams' objections.

**Background**

On February 21, 2017, Williams was arrested in the Northern District of Georgia on a warrant issued in Case No. 16 CR 371 in the Northern District of Illinois. After his arrest, specifically between February 23 and March 11, 2017, Williams made numerous recorded jail calls to co-defendants Alexander and Jamison in an effort to coordinate the receipt of a narcotics shipment from Hong Kong to Atlanta and then the forwarding of that narcotics shipment from Atlanta to Chicago. Homeland Security Investigations ("HIS") monitored these calls. During some of these

calls, Williams directed Jamison to initiate three-way calls with Black, who was waiting for the drugs to arrive at the residence of his associate "Maria Gonzalez" in Chicago.

Based on information obtained from the recorded calls, law enforcement identified, intercepted, and searched the package Alexander had shipped to Chicago per Williams' instructions. The package contained over 1 kilogram of a mixture and substance containing furanyl fentanyl. Once intercepted, law enforcement replaced the furanyl fentanyl with fake narcotics and conducted a controlled delivery. They then arrested Black when he arrived to take possession of the fake drugs.

**Discussion**

*Existence of Conspiracy*

"Under long-settled circuit law, a district court may admit co-conspirator statements conditionally based on the government's pretrial proffer, known in this circuit as a '*Santiago* proffer.'" *United States v. Davis*, 845 F.3d 282, 286 (7th Cir. 2016). In response to the government's *Santiago* proffer, Williams first argues that the government failed to establish the existence of a conspiracy outside of the co-conspirator statements in the *Santiago* proffer. "Under Rule 801(d)(2)(E), co-conspirator statements are admissible against a defendant if the trial judge finds by a preponderance of the evidence that (1) a conspiracy existed, (2) the defendant and the declarant were involved in the conspiracy, and (3) the statements were made during and in furtherance of the conspiracy." *Id.*; *see also United States v. Harris*, 585 F.3d 394, 398 (7th Cir. 2009). "In considering whether to admit alleged co-conspirator statements conditionally, the district court may consider the contents of the statements themselves," however, "the record must also contain independent evidence corroborating the existence of the conspiracy and the participation of defendant and declarant." *Davis*, 845 F.3d at 286.

At this juncture, the government has presented more than the co-conspirators' statements to establish that a conspiracy existed. This evidence includes shipping records maintained by the

2

United States Postal Inspection Service showing that two international packages from Hong Kong were delivered to an Atlanta hair salon where Alexander worked. Other USPS records show that Alexander went to a post office in Atlanta and mailed an express parcel to Chicago. Further evidence supporting the existence of the conspiracy includes Western Union records reflecting a payment to Alexander, which was for his role in the conspiracy. The recovery and interception of the furanyl fentanyl from the express parcel shipped from Atlanta to Chicago also supports the conclusion that a conspiracy existed. As such, the government has presented evidence that a conspiracy existed between Williams, Jamison, and Alexander outside of the Rule 801(d)(2)(E) statements that the government has proffered.

Nonetheless, Williams asserts that a conspiracy must involve multiple transactions, numerous customers, or ongoing conduct rather than just possession and distribution of a single package of furanyl fentanyl. Williams' argument is misplaced. The definition of conspiracy pursuant to the Seventh Circuit Pattern Criminal Jury Instructions clearly states that only one crime is necessary: "A 'conspiracy' is an express or implied agreement between two or more persons to commit a crime." 7th Cir. Pattern Crim. Jury Inst., 5.09 (2020 ed.); *see also United States v. Jimenez Recio*, 537 U.S. 270, 274, 123 S.Ct. 819, 154 Led.2d 744 (2003) ("The Court has repeatedly said that the essence of a conspiracy is 'an agreement to commit an unlawful act.'") (citation omitted). In the meantime, Williams fails to point to any legal authority that there must be numerous customers, multiple transactions, transactions, or ongoing conduct for a conspiracy to exist, and the Court did not find any such authority, controlling or otherwise.

Therefore, Williams' objections based on the lack of a conspiracy are unavailing. As such, the Court will not address Williams' objections based on the lack of a conspiracy when discussing the individual calls the government has proffered as co-conspirator statements under Rule 801(d)(2)(E) because any such objection is without merit.

*Buyer-Seller Relationship*

Williams also argues that the government cannot establish a conspiracy existed because evidence of a buyer-seller relationship, alone, is insufficient to support the existence of a conspiracy. *United States v. Moreno*, 922 F.3d 787, 794 (7th Cir. 2019) ("Although every drug deal involves an unlawful agreement to exchange drugs, ... a buyer-seller arrangement can't by itself be the basis of a conspiracy conviction because there is no common purpose."). Black, the buyer, was not charged with conspiracy—Williams, Jamison, and Alexander were—and they were all on the seller side of the conspiracy. As discussed, the government has presented evidence that Williams, through Alexander and Jamison, orchestrated the procuring and distribution of the mixture and substance containing furanyl fentanyl that was originally sent from Hong Kong to Alexander's place of work in Atlanta. Following Williams' instructions, Alexander then sent the furanyl fentanyl to Chicago. The buyer-seller defense does not apply under the circumstances because the co-conspirators were all on the seller's side of the drug transaction. *See, e.g., United States v. Payton*, 328 F.3d 910, 912 (7th Cir. 2003). Williams' objections to statements based on the buyer-seller defense are overruled, and the Court will not address these objections in the context of the proffered calls set forth by the government.

*Black's Statements*

Williams next asserts that because Black was not part of the conspiracy, if the Court were to admit Black's telephone conversations into evidence, Williams' Sixth Amendment right to confrontation would be violated if Black does not take the stand. *See Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Under *Bruton,* "[a] defendant is deprived of his rights under the Confrontation Clause when his nontestifying codefendant's confession naming him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant." *Richardson v. Marsh,* 481 U.S. 200, 201–02, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). In short, *Bruton* is triggered when a non-testifying co-defendant's confession

4

expressly implicates the defendant in a crime. *See United States v. Jett*, 908 F.3d 252, 276 (7th Cir. 2018).

Williams does not identify which of Black's statements amounted to a confession expressly implicating him. Indeed, in the February 25, 2017 Clips B and C, Williams and Black discuss the need to move forward with the drug deal. Similarly, in the March 1, 2017 Clips A and B, Williams and Black discuss the logistics of the drug deal and when Black should pick up the drugs from his associate "Maria Gonzalez." In the March 7, 2017 Clip A, Williams and Black discussed the status of the drug deal and plans for the delivery. Last, in the March 8, 2017 Clip A, Black and Williams discuss the status of the deal and the parcel in transit. In sum, there is no *Bruton* problem because Black's statements did not amount to a confession expressly implicating Williams. Accordingly, Black's statements are admissions by a party-opponent under Rule 801(d)(2)(A), which excludes from the definition of hearsay any statements that are "offered against an opposing party and [were] made by the party in an individual or representative capacity." The statements are also admissible because the government offers Black's statements to provide context for Williams' conduct and not for the statement's truth. *United States v. Norton*, 893 F.3d 464, 467 (7th Cir. 2018).

Turning to Black's other telephone conversations presented in the government's *Santiago* proffer, his conversations in February 25, 2017 Clip D and March 11, 2017 Clip A involve unidentified persons who are not part of the conspiracy. Because there is no evidence about these individuals as to what role they played in the conspiracy, these calls do not fall within Rules 801(d)(2)(E) or 801(d)(2)(A).

*In Furtherance of the Conspiracy*

Williams additionally argues that many of the statements in the government's proffer are not in furtherance of the conspiracy. A "co-conspirator statement satisfies the 'in furtherance' requirement when the statement is 'part of the information flow between conspirators intended to

5

help each perform a role.'" *United States v. Johnson*, 927 F.2d 999, 1002 (7th Cir. 1991) (citation omitted). "A statement in furtherance might, for example, recruit other conspirators, control damage to an ongoing conspiracy or keep conspirators advised about the progress of the conspiracy." *Id.* Also, a "statement may be admissible under Rule 801(d)(2)(E) even if it is not 'exclusively, or even primarily, made to further the conspiracy.'" *United States v. Heron*, 721 F.3d 896, 903 (7th Cir. 2013) (citation omitted). In his objections, Williams contends that many of the proffered statements are "[m]ere 'idle chatter,' narrative declarations and superfluous casual remarks." *Johnson*, 927 F.2d at 1002 (citation omitted).

Turning to the calls Williams argues are not in furtherance of the conspiracy, the Court notes that the majority of these calls discuss the progress and logistics of the conspiracy, namely, whether Alexander received the narcotics packages from overseas, how Alexander would ship the package to Chicago, and how Black would receive the package in Chicago. The Court further notes that the majority of the challenged calls are also admissions by a party-opponent under Rule 801(d)(2)(A), and thus not hearsay.

With this in mind, the Court overrules Williams' objection to the February 23, 2017 calls at Clips A and B where Williams and Alexander talk about the "two letters" or "two postcards" which is code for two shipments of narcotics. Williams and Alexander also discussed the address in Chicago where the narcotics were to be shipped. These statements are in furtherance of the drug conspiracy.

As to the February 24, 2017 calls, in the first call, Williams talked to Jamison about getting in contact with Black and provided Black's phone number to her. Williams asked Jamison to contact Black about talking over the phone and Jamison suggested a three-way call. Later that same day, Williams made another call to Jamison explaining that he talked to Black and Black would text him his phone number so they could make a three-way call. Williams called Jamison one more time that

6

day to discuss whether Williams should call Black directly or have Jamison initiate a three-way call. These calls are admissible because they discuss the logistics of calling Black to further the drug deal, even if the calls did not exclusively talk about furthering the conspiracy as Williams argues. *See Heron*, 721 F.3d at 903.

On February 25, 2017, Williams called Jamison explaining that he was calling from a phone system that only allowed him to enter five numbers, so he could not call Black with the phone number Jamison provided the day before. Williams stated that a three-way call was necessary. Williams objects to this conversation as prejudicial because the jury will infer he is calling from jail. These statements are not prejudicial because the government will be calling a witness to testify to the authenticity of the calls made from the Georgia detention center, and thus the jury will know that Williams made the calls from jail. If Williams stipulates to the authenticity of the calls, the government states it will redact the comments about the limitations of the jail telephone system.

On that same day, Williams directed Jamison to make a three-way call to Black, who joined in the call. During this call, Williams and Black discussed the pending drug deal. Williams directing Jamison to make the three-way call advanced the pending drug deal because she facilitated Black's participation in the conversation. Although Black was not charged with conspiracy, his comments are admissible as a statement offered against a party-opponent under Rule 801(d)(2)(A). Last, any statements made about the dark web (AlphaBay) concern the conspiracy because the co-conspirators used the dark web to obtain the drug parcels from Hong Kong.

Turning to the call made on February 26, 2017, Williams contacted Alexander and was concerned that the parcels being sent via international mail had not yet arrived at Alexander's workplace. Williams explained that it "might be a trick." This comment was a warning to Alexander about the parcels being possibly tracked by law enforcement, thus, it concerned the progress of the conspiracy. It is also a statement made by a party-opponent.

7

On February 28, 2017, Williams had several telephone conversations. In the first conversation, he called Jamison instructing her to get another phone so she could call Black. Williams suggested that Jamison needed to stay in contact with Black "because he the only one who gonna help you if you need some help. And he the only one who gonna help me out there if I need some help." Williams contends that these statements are prejudicial because they reference Williams being in jail. The Court agrees to the extent Williams stipulates to the authenticity of the calls, as discussed above.

The second February 28 call concerns Williams calling Alexander, who confirmed that he had received the "letters," namely, the parcels from Hong Kong containing the furanyl fentanyl. In response, Williams would have someone send money to Alexander via Western Union and discussed how Alexander should ship the package to Chicago. These statements are admissible because Williams discussed Alexander's payment for his role in the conspiracy and the logistics of shipping the narcotics to Chicago.

Similarly, the call Williams made on February 28 where he instruction Jamison to tell Black to obtain money for the drug deal facilitated the drug transaction. In that same call, Williams learned from Jamison that he had two open warrants for other drug cases. The government maintains that it will only seek admission of this statement if Williams takes the stand at trial. Williams argues that evidence of his outstanding warrants is improper propensity evidence under Rule 404(b). Because the government has not explained how this other act evidence is supported by a propensity free chain of reasoning, *see United States v. Gomez*, 763 F.3d 845, 856 (7th Cir. 2014) (en banc), the Court reserves ruling on this statement until trial.

In the last call made on February 28, Williams instructed Jamison to call Black to tell him that Williams "had something on standby." Williams objects because the instruction to Jamison could relate to some other, uncharged drug deal between Williams and Black. In the context

8

Williams' other statements made in close proximity to this statement, it is a stretch that Williams' comment involves something more than facilitating the drug conspiracy at issue in this prosecution. This comment is made in furtherance of the conspiracy in that Williams instructed Jamison to report the status of the drug deal to Black.

Next, on March 1, 2017, Williams called Jamison, who then initiated a three-way call with Black. In the three-way call, Black and Williams discussed the pending drug transaction. During this call, Williams stated "I never kept Johnson's shit," which refers to a prior drug transaction. The government states that it will redact this statement based on Williams' objection that this is improper propensity evidence Rule 404(b). Williams then called Alexander and gave him instructions on how to mail the "clothes," meaning the drug parcel. Because the government will be calling Postal Inspector Mike Todd to explain the code words used in the calls, Williams' objection that this statement is vague is overruled. Thereafter, Williams called Jamison instructing her to send money to Alexander, wait for Alexander to send the tracking numbers for the package to be sent to Chicago, and track the code to Black. Williams also called Alexander about the sending of the "clothes." These are instructions concerning the progress of the drug conspiracy and are admissible under Rule 801(d)(2)(E).

Williams made other calls on March 1, including another call to Jamison directing her to have an associate send the Western Union payment to Alexander. That Alexander was paid for his part of the conspiracy before its completion does not turn the conspiracy into a buyer-seller agreement as Williams argues, especially because Williams fails to set forth legal authority in support of this objection. Jamison's request that another person complete the payment via Western Union is of no moment because the payment was in furtherance of the conspiracy and using a third person to pay Alexander protected Jamison from scrutiny. Williams called Jamison later to see if the associate had paid Alexander, after which Jamison stated, "no problem." This conversation confirms

9

Alexander's payment for his role in the conspiracy. In another call on March 1, Jamison cautioned Williams about doing "stupid shit" on the phone and that it was "not safe." Williams responded that he was not incriminating Jamison, which is an admission by a party-opponent. Williams' objection that this was merely an argument between Williams and Jamison is belied by the context of Williams' numerous calls to Jamison facilitating the conspiracy. Williams' argument that "not safe" indicates he is in jail is a stretch, and, as discussed, the jury will already know that Williams was in jail when he made the calls.

Following Williams' directions, Jamison sent a text message to Alexander on March 1 containing an image of the Western Union receipt with the control number circled. Williams' objection that the government had not set forth a proper foundation to admit this evidence is premature. In presenting its *Santiago* proffer, the government is seeking a conditional ruling on admissibility. Williams' remaining objections to the calls made on March 1 concern his incorrect conclusion that the government has not established that there was a conspiracy and that the drug transaction in this lawsuit is subject to the buyer-seller defense. The Court has already rejected these arguments, as stated in detail above.

On March 2, 2017, Alexander texted Jamison an image of the USPS tracking number of the parcel mailed to Chicago. Williams objects to the text as not properly authenticated, which, as discussed, is an issue for trial. That same day, Williams called Jamison, at which time Jamison discussed a previous conversation about selling drugs where she recounted Williams stating "Shit, I sell drugs! That's what I do!" Williams then warned Jamison to stop being "reckless" on the phone. The government contends that Jamison's statement of what Williams said falls under established exceptions to Rule 404(b). In particular, the government asserts that it seeks admission of this statement to show knowledge. Again, the Court reserves ruling until trial when the government will have an opportunity to fulfill the requirements under *Gomez*.

Also, on March 2, consistent with Williams' directions, Jamison texted Black stating, "Be on point B4 10:30," indicating when Black should be ready to receive the narcotics shipment. Jamison sent the text to Black in furtherance of the conspiracy, namely, to keep Black informed on the delivery of the drug parcel. On March 3, Jamison also sent texts about the parcel's delivery. The government will authenticate these text messages at trial. The remainder of Williams' objections regarding the March 2 calls and May 3 texts concern either the buyer-seller defense or his argument that the government did not establish the existence of a conspiracy in the first instance. As discussed, the Court rejects these arguments. As to the iPhone recovered from Black at his arrest showing he conducted Google searches about how to interpret USPS tracking information, the government agrees that Black's internet search history is not admissible in Williams' severed trial.

From March 3 until March 6, the U.S. Marshalls transported Williams from Georgia to the Metropolitan Correctional Center ("MCC") in Chicago. Once at the MCC, on March 7, Williams called Jamison about the parcel. During the call, Williams asked Jamison if Black got the parcel, to which Jamison responded he had not. She also told Williams about information that Black had told her about the problems with the delivery and a re-delivery. What Black told Jamison is hearsay, and the government's argument that the statements do not go to the truth are unconvincing. The Court sustains Williams' objection to the March 7 call starting at 11:20 a.m., Clip A.

In the May 7 Clip B, Williams gave Jamison directions on responding to Black if he asked for a refund. Williams stated: "I was hoping that shit been came by now…I just want that…out the way man. That's it." This statement is in furtherance of the conspiracy because it involves the delivery of the parcel sent via USPS. Clip C contains hearsay, namely, "he said the lady called" and "They said they had it," otherwise the remainder of the conversation is admissible because it relates to delivery of the drug parcel. In the afternoon of May 7, Williams called Jamison, at which time they had another conversation about the status of the parcel and the planned re-delivery of the parcel the

11

next day.  Although redundant, the statements discuss the progress of the drug delivery.  Later that evening, Williams had a three-way call with Jamison and Black where they discussed the delivery of the package.  The comments Black attributed to "Maria Gonzalez," the addressee of the package, give context to Williams' and Black's conversation, and therefore, does not go to the truth.

At approximately 3:07 p.m. on March 8, 2017, Williams made a call to Jamison, who then initiated another three-way call with Black to discuss the delivery of the drug parcel.  Williams was concerned that if the package did not get delivered, Black would want his "shit back."  Williams, Black, and Jamison discussed that the shipment was out for delivery.  Williams described his frustration in the package not having been delivered.  Williams objects to certain statements as referencing prior drug deals with Black when Williams stated in the call:  "Every other time some shit done happened like that, it went straight through."  The government agrees to redact the terms "every other time" from this statement.  Williams also objects to the admission of his statement of not being "out there" raising an inference that he is in jail.  Unless Williams stipulates to the authenticity of the jail calls, the jury will know he was in jail when he made these statements.

Next, in the early evening of March 8, Williams called Jamison to discuss the status of the parcel and instructed her about the issue of a refund to Black if the parcel did not get delivered, which concerned the progress of the delivery.  Williams also asked Jamison about her personal life, which is superfluous and should be redacted.  The Court sustains Williams' objection as to the personal communications between Williams and Jamison.  At 6:26 p.m. that same day, Williams called Jamison again about the status of the package and the need to refund Black's customer.  Williams also discusses his frustration about the delivery not being made, which is not a statement in furtherance of the conspiracy, but rather describes his emotions.  The Court sustains Williams' objection as to his statements about being frustrated.

12

On March 9, 2017, Williams called Jamison who stated: "They got it." Williams responded: "Ah, ok… Now I can have, now I got a smile on my face. I'm glad cause the last thing I wanted a motherfucker to think was, was motherfucker was on some bullshit." Williams and Jamison's discussion concerned the progress of the conspiracy, and is therefore admissible. Later that day, Williams called Jamison, who stated that Black had not answered his phone. Williams responded: "I just hope everything with Bro cool, man. For real, cause that shit don't sound right." This discussion concerned Williams' and Jamison's assessment and control of any damage to the conspiracy due to Black not answering his phone. Williams and Jamison had additional conversations on March 9 about why Black was not answering his phone—calling into question whether the conspiracy had been successful. Although redundant, these statements go to the conspiracy. Williams' statements made on March 9 also are admissions by a party-opponent under Rule 801(d)(2)(A).

*Statements Made after the Conspiracy Failed*

Next, Williams maintains that statements made after the conspiracy failed are inadmissible under Rule 801(d)(2)(E). Indeed, the Seventh Circuit has held that statements made after a defendant has been arrested are not "during the course and in furtherance of the conspiracy." *United States v. Sandoval-Curiel*, 50 F.3d 1389, 1392 (7th Cir. 1995). Here, the conspiracy failed when Black was arrested on May 9, 2017.

Despite the conspiracy failing on May 9, the calls made on March 10 fall under Rule 801(d)(2)(A) as admissions by a party-opponent. The March 10 calls were between Williams and Jamison concerning Jamison's attempt to contact Black and their discovery of Black's arrest. The March 11 call was a jail call made by Black to an unidentified person who was not part of the conspiracy. As discussed above, because there is no evidence about this individual as to what role

13

he or she played in the conspiracy, this call does not fall within Federal Rules of Evidence 801(d)(2)(E) or 801(d)(2)(A).

On a final note, Williams maintains that many of the calls in the *Santiago* proffer are redundant. To a certain extent, the Court agrees that if the government seeks to admit all of the statements set forth in its proffer, juror confusion may result. That said, without more, objections based on redundancy alone are insufficient to overcome the government's proffer at this stage of the proceedings.

**Conclusion**

For the foregoing reasons, the Court reserves in part, grants in part, and denies in part the government's *Santiago* proffer over Williams' objections [251].

**IT IS SO ORDERED.**

Date: 6/1/2021

Entered: _____
SHARON JOHNSON COLEMAN
United States District Judge